CRAIN v. BOARD OF DIRECTORS OF ST. FRANCIS
LEVEE DISTRICT (1).

4-3577

BOARD OF DIRECTORS OF ST. FRANCIS LEVEE
DISTRICT v. WAINWRIGHT (2).

4-3678

Opinion delivered February 11, 1935.

306

*Daggett & Daggett* and *Coleman & Riddick*, for appellant.

*J. T. Coston* and *Rose, Hemingway, Cantrell & Loughborough,* for appellee:

(2) Appeal from Lee Chancery Court; *A. L. Hutchins,* Chancellor; affirmed.

*Burk Mann* (for Levee Board), *Daggett & Daggett* and *Coleman & Riddick* (for Mixon), for appellants.

*Rose, Hemingway, Cantrell & Loughborough, J. G. Coston* and *J. T. Coston,* for appellees.

BUTLER, J. The above cases involve the same questions, and have been consolidated in this court. The records in these cases disclose the following facts:

The St. Francis Levee District was organized in 1893 for the purpose of protecting the lands of the district against overflows of the Mississippi River, and embraces within its boundaries a point of land in the shape of a peninsula bounded on three sides by the Mississippi River located in the southern part of Mississippi County, known as Pecan Point. The lands involved in this controversy are situated on this point of land and are owned by the interveners, Raney and others. The location of the levee was dictated by the engineers of the Mississippi River Commission, and, when first constructed, followed the contour of Pecan Point. The owners of the lands desired to know if the levee would be maintained permanently so as to protect the same, and were assured in writing by the commission that this would be done. Upon this assurance, the owners of the land continued to pay their levee tax for a period of more than thirty years, and proceeded to improve their property to a high degree of cultivation, building their homes, barns, tenant houses

and cotton gins, so that Pecan Point became one of the most valuable and highly improved sections in the county.

In 1927 there was a flood of unusual height in the Mississippi River which broke many of the levees along its banks including the levees in southeast Missouri, the waters from which covered a large portion of the territory of the levee district breaking also a portion of its levees. Owing to changes in the channel of the river and dredging operations made necessary thereby, the current of the river was changed so as to flow against the tip end of Pecan Point. The bank of the river at this point before this time had been stable, but the force of the current as changed caused the bank to cave which resulted in the sloughing away of twelve hundred feet of the levee. The flood of 1927 led to the belief that the existing levees were inadequate to restrain the waters of the Mississippi River, and, in consequence of this, Congress in 1928 adopted what is known as the Flood Control Act (33 USCA, §§ 702A to 702M). This act provided for the raising of the levees so as to render them adequate against any flood which might be anticipated. Large sums of money were appropriated for this purpose; plans were made for the enlargement of the levees of the St. Francis Levee District, involving the abandonment of the levee around Pecan Point and the building of a cut-off levee. The reason for this was that it was estimated by the engineers of the Flood Control Commission that it would cost $650,000 to raise the levee around the Point, whereas it would only cost $250,000 to build the cut-off levee, thus effecting a saving of $400,000.

During the time the lands on Pecan Point were being protected and improved, an elaborate system of drainage had been constructed by which they were well drained. The cut-off levee closed these drains. Because the cultivated lands on Pecan Point were entirely surrounded by the old and new levees, it became necessary to change the system of drainage. Under the conditions created by the cut-off levee, it was necessary to install a floodgate at a point on the Mississippi River. In periods of high water this floodgate would be closed, so that all the rainfall was imprisoned, as was also the seep water passing through

the soil beneath the levees, rendering the drainage system less adequate to drain the lands than the one theretofore existing, and causing the lands to become less valuable on that account.

The cultivated lands on Pecan Point embraced 2,708 and a fraction acres, the lands not in cultivation being about 375 acres, which were worth, before the building of the cut-off levee and the abandonment of the levee around the Point, from $125 to $150 an acre, and the lands not in cultivation $50 to $75 an acre. Because of the change in the construction of the levees, these lands have greatly depreciated in value. The landowners, if permitted, are unable to maintain the levees around the Point, and their deterioration make it certain that any considerable flood would entirely sweep away these levees and cause the destruction of all property located on the Point. This has caused a collapse in their market value.

Immediately after the passage of the Flood Control Act, and the contemplated change in the levees, to-wit, on July 9, 1929, the St. Francis Levee Board adopted a resolution reciting that an emergency existed in the levee situation at Pecan Point by reason of the threatened destruction of the levees because of the caving bank of the river; that, owing to the delay in the interpretation of the Flood Control Law as to compensation to be paid the landowners for damages occasioned by reason of the proposed change in the levee, litigation was threatened between the board of directors of the St. Francis Levee District and the landowners which would prevent the construction of a levee at a point designated, or to be designated, by the United States engineers in time to securely protect the district against damages from the recurring floods of the river. Because of these facts it was resolved by the board of directors that its attorney be instructed to immediately file condemnation proceedings and make no objection to the report of the board of appraisers as to the damage to the lands between the location of the old levee and the new levee, if this appraisal did not exceed the sum of $75 per acre for the cleared land and $40 per acre for the woodland. The resolution provided further that it should be dependent

upon the question of personal liability of the members and officers of the board of directors of the district, and, if there was no personal liability, the resolution was to become effective. The question of personal liability was to be determined by the opinion of a chosen attorney.

Pursuant to the resolution, on July 13, 1929, the levee district brought suit. Appraisers were appointed as provided by § 2 of act 53 of the Acts of 1905. The appraisers made their report to the court, assessing the damage to the lands actually taken for the levee at $125 per acre, and for the damage to the lands lying on Pecan Point—by reason of the withdrawal of levee protection—at $75 per acre for the cultivated lands and $25 per acre for lands not in cultivation.

On the 23d of December, 1929, the levee board adopted another resolution by which it acknowledged that the damage caused by impairment of drainage was $20 per acre. It appears that this sum was allowed and paid by the United States Government, and also the $125 per acre for the lands actually taken in the construction of the cut-off levee. This money seems to have been used by the landowners in repairing the old levee.

The question arose as to whether or not the levee district was legally liable for damages occasioned by the withdrawal of flood protection from the lands located on Pecan Point, and thereupon the owners instituted a joint action for damages in the circuit court of Mississippi County on the 10th day of November, 1930, which appears not to have been pressed and is still pending. On July 14, 1931, the levee district board acknowledged its obligation to the landowners and its commitment to the payment of damages for the withdrawal of levee protection in the sum of $75 per acre for the cultivated land, and $40 per acre for the wood land, if it had legal authority to make such payments, and instructed its attorney to make no appeal from any judgment entered against the board in an amount not to exceed said sums. Again, on October 21, 1931, the board acknowledged its commitment to the payment of these damages and pledged itself to assist the landowners in the passage of a law

permitting the board to pay the damages in accordance with these resolutions.

Act No. 14 of the acts of Special Session of the General Assembly was approved April 14, 1932, § 1 of which is as follows: "In all cases where the board of directors or commissioners of any levee district has, prior or subsequent to the passage of this act, agreed, contracted or promised, formally or informally, to pay any landowner or landowners for damages to land caused by withdrawal of levee protection therefrom or by enclosing such land within a loop or circle of such levee, or surrounding the same by such levee, such agreement, contract, promise or understanding, when evidenced by a writing, whether a formal contract or a resolution of the board, or other instrument, shall be valid and enforceable between the parties except as to the amount of such damages, and the amount of such damages which the landowner or landowners will sustain by reason of change of the levee as provided in this act shall be assessed in the manner provided by act No. 53 of the Acts of 1905."

Pursuant to the resolutions heretofore noted, and in order to carry the same into effect, the levee district made application to the Public Works Administration for the loan of $552,000 with which to pay for the rights-of-way and damages to adjacent properties. Among the items named in the application for the loan was $135,000 to pay the damages to the owners of property on Pecan Point.

On October 11, 1933, the levee board again passed a resolution with respect to the payment of damages to the landowners, determined to be the sum of $139,743.78, to be paid in installments, the first of $40,000 to be paid December 1, 1933, and the remainder in two annual installments; providing however for the immediate payment in cash of the amount of the damage if and when the loan for which it had made application to the United States Government had been approved and granted. The total sum named was much less than the damage found by the appraisers in 1929 and assented to by the district,

and was in the nature of a compromise, highly advantageous to it.

On the second day of December, 1933, James Baker, a taxpayer of the levee district, brought suit in the Mississippi Chancery Court against the St. Francis Levee District, and the landowners of Pecan Point to cancel the resolution of the board of directors passed on October 11, 1933, and praying that the levee board be enjoined from attempting to carry out the terms of the resolution, and that the defendant landowners be enjoined from collecting or attempting to collect said damages. This action is No. 3577, one of the cases here on appeal. The complaint recited some of the history of the proceedings and events subsequent to the flood of 1927, alleged the passage of the resolution of October 11, 1933, that there had been no appraisement of the damage sustained by the landowners, and that such was a necessary prerequisite to the payment of the damage.

The defendant, levee district, answered admitting the allegations of the complaint, but taking issue with the plaintiff on the question of the necessity of an appraisal before the award of damages. The defendants, landowners, answered denying the material allegations of the complaint, alleging their right to recovery of damages, pleading a judgment of the United States District Court in bar of plaintiff's cause of action, and, with this plea, exhibited and made a part of the record the entire proceedings in said district court.

It appears from these exhibits that on May 16, 1933, one Russell E. Gardner a taxpayer within said levee district and a holder of its bonds, brought suit in the United States District Court for himself and all other landowners of the district in which he alleged the invalidity of the statutes and resolutions of the levee district, and sought to enjoin the district from carrying into effect its resolutions for payment of the damage for the withdrawal of levee protection from the Pecan Point lands. The landowners intervened in that proceeding, resulting in a decree holding that the levee district was under a legal obligation to pay to the landowners the damages sustained for the withdrawal of levee protec-

tion, together with damages for impairment of drainage by reason of the construction of the cut-off levee, all of which was superior to the bonds of the district and entitled to prior payment. The complaint was thereupon dismissed for want of equity. From that decree no appeal was prosecuted, and the same has become final and conclusive.

The case was heard in the chancery court upon the pleadings and stipulation of counsel, and resulted in a decree upholding the resolutions passed by the board of directors of the levee district providing for the payment of damages as valid and binding. J. H. Crain, a taxpayer, intervened and prayed and was granted an appeal to this court.

Thereafter and while the appeal from the above case was still pending in this court, R. L. Mixon, a taxpayer in said levee district, brought suit against the district alleging the invalidity of the various resolutions, and of the agreement by the levee board to pay the damages to the Pecan Point landowners, the inability of the board to purchase the rights-of-way necessary for the levee construction because of lack of funds and the undertaking on its part to divert a large part of its anticipated revenue to the payment of the landowners without providing the rights-of-way required. He further alleged the amount of the outstanding bonds of the district, that the entire revenue of the district was pledged to their payment, and that the contemplated action of the board would result in default in payment of interest on said bonds. He further alleged that no appraisal had been made under act 53 of the Acts of 1905, and that such appraisal was a condition precedent to the authority of the board to pay the damages. The complaint concluded with a prayer for an injunction to restrain the board from carrying into effect the resolution of October 11, 1933, and from paying any money or issuing any certificates of indebtedness to the landowners until the amount thereof had been assessed in accordance with act 53 of the Acts of 1905.

The St. Francis Levee District entered its appearance, and filed its answer admitting the allegations of the

complaint, and submitting to the court "the question whether or not such an appraisement is required by act No. 14 of the Acts of 1932." The landowners intervened setting up their claims, and, by way of cross-complaint, recited the history of Pecan Point with respect to levee protection, and its subsequent abandonment, the amount of their damages occasioned by the withdrawal of said protection, the resolutions of the board admitting such damages, and its agreement to pay the same out of the proceeds of the loan from the United States Government. To the intervention and cross-complaint of the landowners the district filed its plea to the jurisdiction of the court, which was overruled. The district thereupon answered, preserving in said answer its objection and exceptions to the overruling of its plea. The case was heard on the pleadings, the exhibits thereto and the testimony of a number of witnesses relative to the nature and extent of the damage suffered by the landowners.

The court found and decreed that the district is legally liable to the interveners and crosscomplainants for damages amounting, principal and interest, to the sum of $139,743.78 with interest at 6 per cent. from August 25, 1933, to date of payment, and prorated among the interveners the said sum according to their respective interests, giving judgment to each therefor. The court adjudged said damages to be a first lien upon all the revenues of the district, which lien is prior and superior to the lien of the bonds issued by the district, and enjoined the payment thereof until the decree in favor of the interveners had been satisfied. The court further found that the levee board had applied to the governmental agency for a loan of $135,000 to enable it to pay the indebtedness due the interveners, that said loan had been granted, that the money had been borrowed for that exclusive purpose, and is a trust fund which can be used for nothing else. The court accordingly decreed that the levee district board be required to consummate said loan if it had not already done so, and to apply the sum of $135,000 to the payment of the decree in favor of the intervener landowners. From that decree the district prayed, and has duly prosecuted, its appeal to this court.

The appellants in the last named case insist that the Lee Chancery Court was without jurisdiction of the person of the board of the levee district, and for that reason its judgment is void. This contention was settled adversely to the appellants in the recent case of *St. Francis Levee District* v. *Raney, ante* p. 69. Appellants in the cases here consolidated insist that, according to the law as it stood just prior to the passage of act No. 14 of the Acts of 1932 (Special Session), the district is not liable in damages to the landowners under the general rule, and by the express provision of § 9 of act 53 of 1905, to the effect that no damage can be recovered for lands left outside of the levee. Whether the general rule and the statute referred to are applicable to a situation such as is presented by the records in these cases is a question adverted to in *Howington* v. *Friend,* 187 Ark. 411, 61 S. W. (2d) 62, and which we need not further discuss for the reason that in the cases at bar damages occasioned to lands by the withdrawal of levee protection has been affirmed and made enforceable by act No. 14, *supra,* the relevant portion of which has been heretofore quoted.

Under the provisions of act No. 14, *supra,* appellants contend that, before damages could be recovered, the amount of same must be assessed by verdict of a jury. They argue that the reason for this construction is that the funds of the taxpayers will be safeguarded by public trial and cannot be paid out by secret agreements except in cases where boards of appraisers shall be appointed on motion of the board of the levee district. This contention is stated in the brief for appellant Baker as follows:

"The provision of act No. 14 that the amount of the damages occasioned by the withdrawal of levee protection 'shall be assessed' in the manner provided by act No. 53 of the Acts of 1905 means that the amount shall be assessed by the board of appraisers, if the petition to have the amount assessed is filed by the levee board, and that the amount shall be assessed by a jury in the circuit court, if a suit to recover the damages is filed by the landowner. The complaint alleges, and the answer admits, that the amount of the damages in the present

case has never been assessed in the manner provided by act No. 53.''

This contention is based on the following phrase in § 1 of act No. 14, *supra*: "* * * except as to the amount of such damages, and the amount of such damages which the landowner or landowners will sustain by reason of change of the levee as provided in this act shall be assessed in the manner provided by act 53 of the Acts of 1905.''

The United States District Court, in the Gardner case, made exhaustive findings of fact, one of which is this: ''The circuit court of Mississippi County appointed a board of appraisers for the St. Francis Levee District, under § 3934 of Crawford & Moses' Digest, who were called upon to assess the damages to the lands upon Pecan Point, and who assessed those damages resulting from loss of levee protection of $75 per acre for cultivated lands, and $25 per acre for lands not in cultivation; and this assessment was accepted by the landowners, and the board of directors of the St. Francis Levee District agreed with the landowners that they would pay this sum if they could do so without incurring personal responsibility; and accordingly act No. 14 of the Acts of the General Assembly of the State of Arkansas, at the Special Session of 1932, approved April 14, 1932, authorized this payment.'' This finding of fact is abundantly justified by the record.

In the case of *Howington* v. *Friend*, 187 Ark. 411, 61 S. W. (2d) 62, a suit was instituted by Howington against Friend to recover for the use and benefit of the St. Francis Levee District $400 which had been paid Friend by the district. In relocating the levee in 1929 the lands belonging to Friend which had been formerly protected were left by the district between the new levee and the river. The levee district instituted a condemnation suit against Friend. While this suit was pending, the district and Friend entered into an agreement by which Friend was to be paid $10 per acre for his land left between the new levee and the river. This sum was paid by the levee board which amounted to $400. Howington instituted his suit to recover for the district the

sum thus paid, on the theory that, under the rule announced in *City Oil Works* v. *Helena Imp. Dist.*, 149 Ark. 285, 232 S. W. 28, there was no liability for damages accruing by reason of the withdrawal of levee protection. The court distinguished the case before it from the cases relied on and said: "Notwithstanding the board of directors of St. Francis Levee District had no authority under the law to make a contract with appellee at the time this one was made, we are of the opinion that this contract has been validated by act No. 14 of 1932, and is now a binding obligation of the district." In conclusion, the court further said: "Since we have reached the conclusion that the Legislature could have authorized by an appropriate act the recovery of damages for withdrawal of levee protection in the first instance, we now hold that it is authorized to validate and cure by a subsequent act all contracts and agreements with reference to the payment of such damages."

The facts regarding the controversy between the landowners and the district, as found by the district court in the Gardner case, and which the record in these cases supports, are that the circuit court appointed a board of appraisers for the district to assess the lands upon Pecan Point. An assessment was made of $75 per acre for cultivated lands and $25 per acre for lands not in cultivation. This assessment was accepted by the landowners, and the board of directors of the district agreed that it would pay this sum if it could be done without incurring personal responsibility by the officers and board of the district. Act No. 14, *supra*, authorized this payment. These being the facts, we can see no valid distinction between these cases and the case of *Howington* v. *Friend*, and the rule there stated would seem to apply and be conclusive of these controversies. This is true, although the last resolution of the board of the district avowing its liability and agreeing to pay out of the proceeds of the loan from the Government was adopted subsequent to the passage of act No. 14, *supra*, for it but relates to, and is a recognition of, the original agreement of 1929, and, as before noted, a compromise thereof.

We are of the opinion, also, that the construction placed by appellants on act No. 14, *supra,* is unwarranted. In that act there is no provision to the effect that the damages should be ascertained by jury and only in that manner. The act provides that damages shall be assessed and ascertained in accordance with the provisions of act 53 of 1905, the main purpose of which, as disclosed by § 1 thereof, was the friendly adjustment and settlement of claims against the district by the landowners within it, and only when such negotiations should prove fruitless was the authority of the courts to be invoked. Section 1 of act No. 53, *supra,* provided in part that the board of directors of levee and drainage districts have authority to enter upon and hold lands, by purchase or otherwise, which may be necessary for the location, relocation, etc., of levees * * *, and that the district shall have power to acquire by compromise or agreement with the owners all property required by it, and may settle all claims for compensation or damage. It is only where an agreement can not be reached that the ascertainment of damages by appraisement is authorized, and the necessity for juries arises only when the appraisement is not acceptable.

In the cases before us, appraisements were made by a board duly authorized which have been acceptable to the district and to the landowners. There has therefore never been a necessity for the damages to be ascertained by a jury as provided by act No. 53, *supra.* Nor was it a private or clandestine agreement such as suggested by appellants, but a public one of general knowledge since 1929.

It is to be remembered that the Lee Chancery Court and the Mississippi Chancery Court acquired jurisdiction by consent of the levee district (if it may be that these courts had no jurisdiction otherwise, which we do not now hold), and in the suits acquiesced in by the levee district the landowners were the interveners. In these suits the end sought to be obtained by the plaintiffs was the prevention through the equitable remedy of injunction of the payment to the landowners of the damages sustained by reason of the withdrawal of levee protec-

tion. Equity therefore had jurisdiction of the subject-matter. The jurisdiction of the chancery court was invoked by the taxpayers and acquiesced in by the levee district. In *St. Francis Levee District* v. *Raney, supra,* we held that the intervention of the landowners and their cross action was incident to the main suit of which the original litigants were bound to take notice, and which clothed the chancery court with jurisdiction of the intervention. That court, under familiar rules, having acquired jurisdiction for one purpose, might retain it for all purposes, and grant adequate relief, both legal and equitable, to which the parties might be entitled, and under this rule, might ascertain and award damages. *Fulcher* v. *Dierks Lbr. & Coal Co.,* 164 Ark. 261, 261 S. W. 645; *Oliver* v. *Oliver,* 182 Ark. 1025, 34 S. W. (2d) 226; *City National Bank* v. *Riggs,* 188 Ark. 420, 66 S. W. (2d) 293.

On the trial of the Mixon case, the court did not content itself, in order to arrive at the damage sustained by the landowner, with only a scrutiny of the appraisement by the board of appraisers and the resolutions of the district, but heard the testimony of a number of witnesses, some of whom are disinterested as to the damage sustained by the landowners on Pecan Point. All of the estimates of the witnesses as to this damage placed the sum above that found by the appraisers and agreed to by the district. Therefore the chancellor was justified by this evidence in awarding a judgment for the sum named in the decree.

The last contention made is that the judgment is excessive. This is based on the fact that under the agreement a part of the payments were deferred, and the judgment is for the face value of these deferred payments without taking into consideration their present value, which, under ordinary rules of computation, would be for a less sum. This might be true but for the further agreement that the entire amount would be paid in cash if and when a loan from the Government was obtained. The evidence shows that the application of the district for a loan has been approved, and the loan agreement entered into which justifies the decree of the

chancellor that the entire damage shall be paid in cash out of the proceeds of the loan.

It follows from what we have said, that the decrees of the trial courts ought to be and are affirmed.